IN THE DISTRICT COURT OF I

| | |
|---|---|
| CONAGRA FOODS, INC., a Delaware corporation, | CASE NO.: CI 13-6314 |
| Plaintiff | |
| vs. | COMPLAINT |
| YRC WORLDWIDE INC., a Delaware corporation, | |
| Defendant | ASSIGNED TO Troia |

**COMES NOW** the Plaintiff, ConAgra Foods, Inc. ("ConAgra" or "Plaintiff") and for its Complaint against Defendant YRC Worldwide, Inc. ("YRC" or "Defendant"), states and alleges as follows:

#23 FILED
IN DISTRICT COURT
DOUGLAS COUNTY NEBRASKA
AUG 0 2 2013
JOHN M. FRIEND
CLERK DISTRICT COURT

## THE PARTIES

1. ConAgra is a Delaware corporation with its principal place of business in Omaha, Nebraska.

2. YRC Worldwide Inc. is a Delaware corporation with its principal place of business in Overland Park, Kansas.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over the YRC pursuant to Neb. Rev. Stat. § 25-536 because YRC regularly transacts business in Nebraska. Alternatively, the Court has jurisdiction over YRC pursuant to Neb. Rev. Stat. § 25-414 because YRC and ConAgra contractually agreed to submit to the jurisdiction of this Court and to waive any objections based on lack of jurisdiction or improper venue.

4. Venue is proper in Douglas County pursuant to Neb. Rev. Stat. § 25-403.01 because YRC resides in Douglas County under Neb. Rev. Stat. § 25-403.02 and because some part of the transaction out of which the cause of action arose

1

occurred in Douglas County. Venue is also proper in Douglas County because ConAgra and YRC agreed in writing to venue in Douglas County.

## FACTS

5. On September 20, 2008, ConAgra and YRC entered into the LTL Contract Carrier Agreement identified as RDWY Contract #8878 and Contract Number 09-2202 (the "Contract"). A copy of the Contract is attached as Exhibit A.

6. Pursuant to the Contract, YRC was obligated to perform motor contract carriage services to ConAgra for transportation of various freight. In exchange, ConAgra was obligated to pay for YRC's services.

7. Pursuant to the Contract, YRC warranted that in transporting shipments containing food products intended for human or animal consumption, YRC would not utilize equipment that had been utilized for the transportation of hazardous materials within the meaning of 49 U.S.C. § 5102 or solid waste within the meaning of 42 U.S.C. § 6903 or which otherwise is not fully suitable for use in the transportation of any Food, Food Additive, Drug, Cosmetic or Device within the meaning of those terms as used in 21 U.S.C. § 321 or any other applicable law of similar kind or content.

8. On or about November 14, 2011 and pursuant to the Contract, YRC delivered to ConAgra foodstuffs that were loaded in a truck that contained hazardous materials and thereby materially breached the Contract.

## COUNT I

### Breach of Contract

9. ConAgra incorporates the allegations of Paragraphs 1 through 8 of this Complaint as if fully set forth herein.

2

10. ConAgra has performed all of its obligations under the Contract.

11. YRC materially breached the Contract by delivering to ConAgra foodstuffs that were loaded in a truck that also contained hazardous materials.

12. As a result of YRC's breaches, ConAgra has been injured in the amount of $66,865.74.

WHEREFORE, Plaintiff ConAgra Foods, Inc. prays for a judgment against Defendant YRC Worldwide Inc. for damages of $66,865.74, interest as allowed by law, the costs of bringing this action, including reasonable attorney's fees as permitted by law, and any other relief this Court deems just and equitable.

DATED THIS 2 day of August, 2013.

CONAGRA FOODS, INC., Plaintiff

By: _____
BRIAN T. MCKERNAN, #22174
McGrath North Mullin & Kratz, PC LLO
Suite 3700 First National Tower
1601 Dodge Street
Omaha, NE 68102
(402) 341-3070
(402) 341-0216

ATTORNEY FOR PLAINTIFF

<u>**RDWY Contract #8878**</u>                                                                    <u>**Contract Number 09-2202**</u>

## LTL CONTRACT CARRIER AGREEMENT

This Agreement is made and entered into on September 20, 2008 (the "Effective Date"), by **ConAgra Foods, Inc.**, a Delaware corporation, **with its office at One ConAgra Drive, Omaha, NE 68102** ("Shipper"), and **Roadway an operating division of Yellow Roadway Corp, with its office at 1077 Gorge Boulevard, Akron, OH 44310** ("Carrier").

## RECITALS

WHEREAS, Carrier desires and intends to furnish motor contract carriage service to Shipper for transportation of such freight as Shipper deals in, manufactures, has available for transportation or controls, pursuant to 49 U.S.C. Section 14101(b) and the authority granted to Carrier by the Department of Transportation ("DOT") in Docket **MC 2202-Sub 727** and

WHEREAS, Shipper desires and intends to utilize the motor contract carriage services of Carrier, as aforesaid; and

WHEREAS, Shipper is relying on the existence of a valid contract of carriage in (i) tendering freight for shipment pursuant to this Agreement as consignor, and in (ii) receiving freight shipped pursuant to this Agreement as consignee. Carrier is relying on the existence of a valid contract of carriage in accepting and transporting such freight.

## AGREEMENTS

For and in consideration of these premises and the mutual duties and undertakings of the parties as, hereinafter set forth, the parties hereto agree as follows:

1. **Basic Agreement**. Shipper agrees to tender to Carrier at locations that Carrier is authorized to serve directly, for motor transportation by Carrier in interstate, or foreign commerce, a series of shipments of such freight as is within the scope of Carriers authority and 49 U.S.C. Section 14101(b) for delivery to locations that Carrier is authorized to serve directly, subject to the terms and conditions contained in this Agreement. This Agreement includes all mutually agreed upon Appendices between the parties. Carrier agrees to deliver all freight accepted from Shipper in accordance with this Agreement and all applicable Appendices. Carrier agrees to pick up and transport such freight properly and efficiently, and to deliver such freight and perform delivery services as requested by the consignee, subject to the terms and conditions contained in this Agreement. Each shipment transported hereunder shall be evidenced by a receipt in the form agreed to by the parties signed by Carrier and the consignee or consignees, showing the kind and quantity of cargo received and delivered by Carrier. Absence or loss of such receipt form, however, shall not relieve Carrier of responsibility for the freight received and accepted by it. Carrier represents and warrants that it: (i) has and will maintain at all times during the term of this Agreement valid authorization from the DOT or its successor to transport freight and fulfill its other obligations under this Agreement; (ii) will comply with all applicable federal and state laws and regulations and (iii) will comply with all FDA registration, maintenance of records and other applicable requirements in accordance with the Bio-Terrorism Preparedness and Response Act of 2002.

2. **Effect on Tariffs**. The rules and conditions in this Agreement, which includes all Appendices, shall supersede any and all of Carrier's tariffs, rules or other terms or conditions of carriage not incorporated herein. For example, filed tariffs that are not specifically incorporated herein, including but not limited to the Household Goods Carrier Bureau ("HGCB") mileage guide and the National Motor Freight Classification, ICC, NMF 100-AE, or any future issues of such filed tariffs, shall not apply. In addition, notwithstanding any contrary provision of this Agreement or Schedule, the bill of lading, claims resolution, and packaging requirements of National Motor Freight Classification, ICC, NMF 100-AE, or any future issues thereof, are not part of this Agreement and do not apply to the shipments under this Agreement. For purposes of freight classification and packaging requirements, the ICC NMFC provisions relating to freight classification and packaging requirements only shall apply, with the exception of Item 995, which shall not apply. Any changes to any terms or conditions of this Agreement, or to any



tariffs, rules or other provisions incorporated herein by reference, must be agreed upon by both parties in writing. No change in any of Carrier's tariffs, rules, or other terms or conditions of carriage shall be binding on Shipper unless Shipper agrees in writing to such change and a copy of the revised tariff, rule, term or condition is provided to Shipper. Shipper shall not be deemed to be on constructive notice of any such changes made unilaterally by Carrier. If any terms or conditions of this Agreement are inconsistent with any of Carrier's tariffs, rules, bill of lading or other terms or conditions referred to herein, the provisions of this Agreement shall govern.

3. **Compensation**. As compensation for the service provided by Carrier hereunder, Shipper shall pay Carrier in accordance with the schedule of rates, charges in the applicable Appendices. The level of rates and charges as of the Effective Date will be firm for one (1) year following the Effective Date.

A. To the extent Shipper wishes to transport property on a "freight collect" basis, Carrier agrees to collect its full compensation from the Consignee, without recourse against Shipper provided Shipper executed the "no recourse" Section 7 of the Bill of Lading, and provided Carrier has been given the opportunity to assess the creditworthiness of the Consignee or payor of freight charges. Carrier is not obligated to accept freight on a "freight collect" basis if the payor of the Freight Charges is determined to be an unacceptable credit risk.

4. **Consignee**. Whenever Shipper tenders a shipment under the terms of this Agreement to Carrier with instructions for Carrier to invoice the consignee or third party and the consignee or third party is a party to a contract or discount tariff with Carrier that covers the shipment, the terms and conditions of this Agreement will not apply.

5. **Distinct Needs**. The services provided to Shipper by Carrier pursuant to this Agreement are designed to meet the distinct needs of Shipper. These services include but are not limited to the following: (i) adhere to the rate and terms and conditions noted in Section 3 above and Appendices hereto; (ii) provide customized pick up and delivery, and perform unloading services requested by customers, as described in Section 1; (iii) provide actual notice of changes in terms and conditions, which must be agreed to by Shipper, as described in Sections 2 and 26; (vi) provide customized credit terms, as described in Section 6; (v) meet specified insurance requirements, as described in Section 7; (vi) provide sufficient equipment in condition satisfactory to Shipper to transport all freight tendered by Shipper, as described in Section 8; (vii) comply with the equal opportunity and affirmative action requirements, as applicable, in Section 17; and (viii) comply with the confidentiality provisions in Section 20. Carrier shall also meet Shipper's distinct needs by (ix) providing access to Carrier's electronic database for purposes of exchanging information.

6. **Credit**. Carrier shall promptly render to Shipper invoices for services rendered to Shipper hereunder., and Shipper shall settle all undisputed amounts with Carrier within thirty (30) calendar days of receipt by Shipper's authorized bill payment agent by paying to Carrier an amount equal to the total of all undisputed outstanding invoices.

7. **Insurance**. Carrier, at its cost and expense, shall procure and maintain in force continuously throughout the term of this Agreement the following insurance policies

Commercial General Liability Insurance. Commercial General Liability Insurance, including blanket contractual coverage, for bodily injury and property damage in the amount of one million dollars ($1,000,000.00) combined single limit per occurrence. Carrier's policy must contain an endorsement naming Shipper as an additional insured to the extent of Carrier's indemnity obligations set forth herein. Said policy shall also include a severability of interests clause or cross-liability endorsement extending coverage to a claim by an additional insured against the named insured.

Automobile Bodily Injury and Property Damage Insurance. Automobile Bodily Injury and Property Damage Insurance protecting against claims for bodily injury, including accidental death, and loss of or damage to property in the amount of two million dollars ($2,000,000.00) per occurrence. Carrier may utilize an umbrella policy to meet these requirements. Carrier's policy must contain an endorsement naming Shipper as an additional

insured to the extent of Carrier's indemnity obligations set forth herein. Said policy shall also include a severability of interests clause or cross-liability endorsement extending coverage to a claim by an additional insured against the named insured.

   Cargo Liability Insurance. Cargo liability Insurance with a liability limit sufficient to cover each shipment container for a maximum value of up to one hundred twenty-five thousand dollars ($125,000.00) per occurrence.

   Worker's Compensation. Worker's compensation or similar coverage as required by Applicable Law including, without limitation, the U.S. Longshoreman and Harbor Workers Compensation Act and the Federal Employees Liability Act.

   If any Federal, State, Provincial or Local government regulatory body prescribes minimum amounts of insurance in excess of the amounts prescribed herein, such required insurance minimums will take precedence and shall be required of Carrier. Prior to the time that Shipments are transported by Carrier, Carrier shall furnish to Shipper a certificate or certificates evidencing the insurance policies and endorsements. Prior to cancellation or non-renewal of, or material change in, any policy or endorsements upon renewal or otherwise, Carrier and its insurance broker shall furnish Shipper with thirty (30) days' advance written notice thereof, and Carrier's insurance carrier shall indicate on the certificate provided to Shipper its promise to comply with this notice provision. Carrier, at its cost and expense, shall obtain a BMC32 insurance endorsement as part of this Agreement. All insurance policies must remain in force during the existence of this Agreement. Upon Shipper's request, a copy of the endorsement page of all insurance policies and the BMC32 endorsement will be provided by Carrier to Shipper.

All certificates and endorsements shall be issued to:

   ConAgra Foods, Inc.
   7350 World Communications Drive
   Omaha, NE 68122
   Attn: Manager, Transportation Procurement – Insurance

   8. **Equipment**. Carrier, at its cost and expense, shall provide the necessary equipment for Shipper at the time of day requested for the services to be performed hereunder. Carrier shall provide sufficient equipment to Shipper to transport all accepted freight tendered by Shipper on a timely basis. Carrier agrees to provide drop trailers at its expense at Shipper's facility as mutually agreed upon. The equipment shall be adequate and satisfactory to Shipper. Carrier shall maintain such equipment in good and efficient condition, and it shall be suitable for transportation of the kind of freight tendered by Shipper. Carrier, at its cost and expense, shall employ in the operation of such equipment personnel qualified to operate such. Carrier shall procure and maintain such licenses and permits as required by local, state or federal authority with respect to the transportation services to be performed hereunder, and Carrier shall comply with all laws and regulations applicable thereto. Carrier warrants that, in transporting Shipments which contain food products intended for human or animal consumption, it will not utilize Equipment which has been utilized for the transportation of Hazardous Materials within the meaning of 49 U.S.C. §5102 or Solid Waste within the meaning of 42 U.S.C. §6903 or which otherwise is not fully suitable for use in the transportation of any Food, Food Additive, Drug, Cosmetic or Device within the meaning of those terms as used in 21 U.S.C. §321 or any other Applicable Law of similar kind or content. Furthermore, the Carrier agrees that all Equipment provided will comply with the Sanitary Food Transportation Act of 1990 and regulations promulgated hereunder or any other Applicable Law of similar kind or content that is applicable for interstate motor carriers. Equipment may be rejected, at no cost to Shipper, if it does not pass Shipper's inspection standards or otherwise meet Shipper's requirements.

SHIPPER agrees that each shipment subject to this Agreement which contains foodstuffs *i.e.*, edible materials, drugs that are ingested, injected intravenously, or otherwise taken internally, will be tendered to

CARRIER with the notation of " the specific product description" on the bill of lading. Initials and acronyms are not acceptable.

9. **Breach**. Either party may terminate this Agreement in the event the other party materially breaches any representation, warranty or obligation contained in this Agreement and such breach is not remedied within thirty (30) days after written notice is provided to such party specifying the breach.

10. **Nebraska Law-/-Venue/Misc.** This Agreement will be governed by and construed in accordance with the substantive laws of the State of Nebraska, to the extent not inconsistent with applicable federal law, without regard to its choice of law provisions. Any litigation arising under or in any way related to this Agreement, regardless of the party initiating such action, will be brought in the appropriate state or federal courts located in Douglas County, Nebraska. The parties agree to waive any and all challenges based on lack of jurisdiction or improper venue. **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING (INCLUDING ANY COUNTERCLAIM) OF ANY TYPE RELATING TO THIS AGREEMENT.** To the extent allowed by applicable law, Carrier expressly waives (i) pursuant to 49 U.S. Code Section 14101(b), any and all rights and remedies under Part B, Subtitle IV, Title 49, U.S. Code and (ii) any other rights and remedies otherwise provided pursuant to applicable law, to the extent that any of the same are inconsistent with or conflict with any provision of this Agreement.

11. **Independent Contractor**. Carrier shall be an independent contractor and shall have exclusive control and direction of the persons operating the equipment engaged in the transportation services to be performed hereunder. Carrier assumes full responsibility for the payment of local, state and federal payroll taxes or contribution taxes for unemployment insurance, old age pensions, worker's compensation, social security, or other related protection with respect to Carrier employees engaged in the performance of said transportation services. Carrier agrees to comply with such laws and with the applicable rules and regulations promulgated under such laws.

12. **Indemnity**. When loading or unloading is performed by Carrier, Carrier shall indemnify and hold harmless Shipper from and against all claims, loss, damage, fines, expense, actions including, but not limited to, claims for injury to person (including injury resulting in death) and for damage to property (excluding cargo loss and damage) including Carrier's equipment, to the extent such loss, damage or injury is proximately caused by the negligent loading, unloading or negligent transportation activities of Carrier, its agents or employees. Carrier further agrees to defend, indemnify and hold harmless Shipper together with all subsidiaries, divisions, affiliates, parents, assigns, directors, officers, agents and employees of Shipper (from and against any and all claims, demands, actions, causes of action, proceedings, judgments and other liabilities (except cargo loss and damage), obligations, losses, damages, costs and expenses (including reasonable attorneys' fees and costs) to the extent they are due to or arise from: (i) the breach by Carrier of any representation, warranty or obligation contained in this Agreement; or (ii) the negligence or intentional misconduct of Carrier or the negligence or intentional misconduct of Carrier's directors, officers, employees, or agents. When loading or unloading is performed by Shipper, Shipper shall indemnify and hold harmless Carrier from and against all loss, damages, fines, expense, actions and claims for injury to persons (including injury resulting in death) and for damage to property, including Carrier's equipment, to the extent such loss, damage or injury is proximately caused by the negligent loading or unloading activities of Shipper, it agents or employees. To the extent any claim, loss, cause of action or damages arises out of the joint causative or concurrent negligence of the Parties, the Parties' allocable share of any such claim, loss, cause of action or damage shall be borne in proportion to its fault. To the extent that one Party is obligated to indemnify the other Party pursuant to the terms of this Agreement, the indemnifying Party shall have the right to assume the defense of any third party claim.

**Claims**. All claims shall be handled under the provisions of 49 U.S.C. Section 14706 and current regulations issued thereunder by the DOT or Surface Transportation Board ("STB"), including 49 C.F.R. Sections 370.1 through 370.6, for any loss, damage or injury to property occurring while said property is in the possession or control of Carrier pursuant to this Agreement. If a shipment or any part thereof is lost, damaged or destroyed while

Carrier has possession or control of it, Shipper shall submit a claim in writing or electronically to Carrier within nine (9) months of delivery, and in case of complete loss within (9) months of the date of reasonable delivery. Any litigation of a claim for loss or damage against Carrier must be filed by Shipper against Carrier within two (2) years and a day of denial of the claim by Carrier. Shipper's claim for damage or loss shall be measured by Shipper's invoice value of the cargo lost or damaged. Shipper will release Carrier, for domestic shipments, for liability under this Section in excess of $25.00 per pound, per package or $125,000 per shipment unless Shipper has requested excess liability coverage. If Shipper desires to tender a shipment requiring Carrier liability in excess of $25 per pound per package or $125,000 per shipment, whichever is lower, Shipper must indicate in writing on bill of lading at time of shipment the total dollar amount of excess coverage requested. The maximum excess liability is $1,875,000 per shipment, for a total of $2,000,000 when added to the initial maximum coverage. Carrier will assess an additional charge of $0.70 cents per each $100 in excess of the initial maximum liability, subject to minimum excess coverage charge of $37.00. Such charge is in addition to the lawful freight charges otherwise accruing to the shipment. Charges are to be paid by the party responsible for payment of the otherwise applicable freight charges.

For claim purposes, all used machinery or equipment will be considered released to a value not exceeding $5 dollars per pound. This applies on commodities which are used, old, scrap or having value only for reclamation, salvage, reconditioning or reconstruction. Used items which have been reconditioned and not further used prior to shipment will not be considered used equipment.

Released Value Provisions and Commodities are shown in Appendix 150 attached hereto.

Shipments originating in the United States for destinations in Canada shall be governed by the U.S. terms of liability, and the shipment is not released at the Canadian liability limits. Carrier agrees that Shipper's products are proprietary in nature, and that there are restrictions on the sale or distribution of such products in the event of loss or damage to such products during shipment. Carrier waives its salvage rights and its claims to salvage value with respect to such products and agrees not to impose a lien or assert any other claim against Shipper's products if any such products are lost or damaged while in the possession or control of Carrier. The lien provision contained herein does not apply to refused and unclaimed freight.

14. **Hazardous Materials.** Shipper shall identify any loads that contain Hazardous Materials, as defined in the Hazardous Materials Transportation Act, 49 U.S.C. §5101 *et seq.*, as amended, and the regulations of the U.S. Department of Transportation made thereunder, at least 24 hours in advance of tendering to Carrier. Not less than 12 hours prior to the scheduled pick-up time, Carrier shall either accept or decline such load. If Carrier accepts such load, Carrier represents and warrants that it is fully qualified and authorized to transport Hazardous Materials in the United States. Carrier and Shipper certify that they are familiar with U.S. laws and regulations applicable to transportation of Hazardous Materials and that they will comply with all such laws and regulations. Carrier further certifies that its employees, including drivers, have been trained and instructed in the proper method of transporting Hazardous Materials. Upon Carrier request, Shipper will provide a copy of the Material Safety Data Sheet for the Hazardous Materials.

15. **Limitations**. Any overcharge, duplicate payment or unidentified payment shall be audited and written notice thereof shall be given to the other party within twelve (12) months of the date of the original bill. Any bill for undercharges must be issued within (12) months of the date of the original bill.

16. **No Assignment**. This Agreement shall not be assigned or transferred by either party without the written consent of the other party.

17. **EEO/AA**. To the extent they are applicable to this Agreement or to particular shipments hereunder, the equal opportunity and affirmative actions clauses set forth in 41 CFR Section 60-1.4(a), 60-250.4, and 60-741.4 are hereby incorporated by reference and made a part hereof.

**18.     Severability**. If any part, term or provision of this Agreement is declared unlawful or unenforceable, by judicial determination or performance, the remainder of this Agreement shall remain in full force and effect.

**19.     Books/Records/Audits**. Carrier shall maintain and retain complete and accurate books and records relating to its performance under this Agreement. All books and records pertaining to this Agreement shall be made available to Shipper and/or Shipper's third party auditors for inspection for a period of one (1) years after the applicable ship date, upon reasonable prior written notice at any time during Carrier's regular business hours, and without disruption to Carrier's ongoing business.

**20.     Confidentiality**. All confidential business and technical information, including, but not limited to, plans, strategies, financial data, the terms of this Agreement, disclosed in writing, mechanically, orally, or observed on either party's premises shall be kept confidential by the receiving party after the receipt thereof, using the same safeguards as it uses to protect its own commercially confidential information of a similar character, but at least using reasonable care. The receiving party's obligations shall not apply to information that is: (a) proven to be already known to or otherwise in the possession of the receiving party at the time of receipt from the disclosing party; (b) or becomes publicly available or otherwise in the public domain through no act or omission of the receiving party; (c) rightfully obtained by the receiving party from any third party without restriction and without breach of a similar agreement; or (d) independently developed by the receiving party without use of the disclosing party's information. The receiving party shall be entitled to disclose the disclosing party's confidential information as required pursuant to judicial action, or governmental regulations, or as required when working with auditors and lending institutions, or other requirements, *provided* that the receiving party notifies the disclosing party prior to such disclosure and cooperates with the disclosing party in the event the disclosing party elects to legally contest and avoid such disclosure. Carrier is prohibited from using Shipper's name or the names of Shipper's products or the existence of the relationship Carrier has with Shipper in any of Carrier's publicity or promotional efforts, without the prior written consent of Shipper. Carrier may not place any of Shipper's logos, trade names or trademarks on any of Carrier's vehicles or facilities.

**21.     Non-Exclusivity**. Carrier acknowledges that Carrier is not the exclusive provider of these services to Shipper and that Shipper is not obligated to utilize Carrier for any minimum amount of services and that Carrier shall be free to accept freight for transportation from shippers other than Shipper.

**22.     Notices**. All notices which are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be sufficient in all respects if given in writing and delivered personally or mailed by registered, certified or express mail, postage prepaid, or by reputable overnight courier or sent by facsimile as follows:

| | |
|---|---|
| If to Carrier: | Roadway an operating division of Yellow Roadway Corp<br>1077 Gorge Boulevard<br>Akron, OH 44310<br>Attn: Director, Pricing & Yield Management |
| If to Shipper: | ConAgra Foods, Inc.<br>7350 World Communications Dr.<br>Omaha, NE 68102<br>Attn: George Russell<br>Fax:     (402) 517-9337 |
| With a copy to: | ConAgra Foods, Inc.<br>Five ConAgra Drive<br>Omaha, NE 68102<br>Attn:    Nate Mailander<br>Fax:    (402) 516-7439 |

Carrier agrees to notify Shipper immediately, via Fax, of any shipment or portion of a shipment that is damaged or refused upon delivery. Shipper agrees to give disposition within 24 hours of such notification.

**23.   Effective Date/Term.** This Agreement shall become effective on the Effective Date and shall be in effect for three (3) years unless earlier terminated as provided for herein. Thereafter, this Agreement shall automatically renew for one (1) year terms unless either party provides written notice to terminate at any time, including the initial term, with or without cause, by giving at least thirty (30) days prior notice.

**24.   Carrier Authorization.** Carrier will notify Shipper immediately, and in any event before accepting any further shipments for transportation from Shipper, if for any reason Carrier's authorization to transport freight and fulfill its other obligations under this Agreement is canceled, superseded, revoked, limited, abandoned, or modified in any way during the existence of this Agreement.

**25.   Anti-warehousing Provision.** Carrier shall not charge Shipper for warehousing charges or other charges pursuant to a warehousing contract for stops in transit or for delivery of freight to a destination other than as shown on the bill of lading. The provisions of Section 13 relating to claims for loss or damage shall apply until after the freight has been unloaded at the destination shown on the bill of lading. In the event cargo is not accepted, for any reason, at the time it is tendered for delivery, Carrier's liability will change to that of a warehouseman when the cargo reaches and is in Carrier's terminal. Carrier's liability as a warehouseman shall not exceed $25.00 per pound.

**26.   Entire Agreement.** This Agreement and all Appendices contain the entire agreement and understanding of the parties hereto for the covered services and subject matter herein, and supersede all previous agreements or negotiations related to the covered services and subject matter hereof, whether written or oral. No additional or different terms contained in any purchase order, acceptance, invoice, acknowledgement, bill of lading or any other similar document shall be binding on either party. No course of dealing or usage of the trade shall be applicable unless mutually agreed upon in writing by the parties.

**27.   Non-Waiver.** The failure of either party to insist upon the performance of any of the terms, covenants, or conditions of this Agreement or to exercise any right or privilege herein, or the waiver by either party of any breach of any of the terms, covenants, or conditions of this Agreement, shall not be construed as thereafter waiving any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no forbearance or waiver had occurred.

**28.   Force Majeure.** Neither party hereto shall be liable to the other for default of obligations hereunder if such default is caused by strikes, lockouts, casualties, riot, war, act of terror, governmental order, act of God and any other similar circumstances beyond the reasonable control of such party.

**29.   Counterparts.** This Agreement may be executed simultaneously in two (2) or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument.

**30.**     **Governing Appendices.** The following Appendices and all other mutually agreed upon Appendices are an integral part of this Agreement
   (i)    Appendix 10 -   Operating Authority
   (ii)   Appendix 20 -   Services
   (iii)  Appendix 30 –   General Provisions – All Transportation
   (iv)   Appendix 40 –   Freight Rates
   (v)    Appendix 50 –   Motor Transportation (check if applicable ☐)
   (vi)   Appendix 90 –   Other Transportation Services (check if applicable ☐)
   (vii)  Appendix 130-   Fuel Surcharge Schedule
   (viii) Appendix 140 -  Product Security Requirements
   (ix)   Appendix 150 -  Released and Declared Value Commodities and Provisions

**IN WITNESS HEREOF,** the parties have caused their signatures to be executed by their duly authorized officers as of the Effective Date stated above.

ConAgra Foods, Inc

*[signature]*

Signature

Roger M. Liebhon

Print Name

Senior Director Transportation

Title

vP Finance

Signature

*[signature]* Chris Pudenz

Print Name

*[signature]*

Title

Brian R Stouffer

Signature

Dir Trans Proc

Print Name

Roadway an operating division of Yellow Roadway Corp

*[signature]*

Signature

Clay Carpenter

Print Name

Authorized Representative

Title